SLIP OP. 08-105

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
:
GLOBE METALLURGICAL, INC., :
:
        Plaintiff, :
        v. : Before: Jane A. Restani, Chief Judge
:
UNITED STATES, : Consol. Court No. 07-00386
:
        Defendant, : **Public Version**
:
        and :
:
DATONG JINNENG INDUSTRIAL :
SILICON CO., INC., JIANGXI :
GANGYUAN SILICON INDUSTRY :
COMPANY, LTD., and SHANGHAI :
JINNENG INTERNATIONAL TRADE :
CO., LTD., :
:
        Defendant-Intervenors. :
_____:

**OPINION**

[Plaintiff's motion for judgment on the agency record granted in part; Defendant-Intervenors' motion for judgment on the agency record denied.]

Dated: October 1, 2008

      DLA Piper US LLP (William D. Kramer, Clifford E. Stevens, Jr., Jack A. Levy, and Martin Schaefermeier) for the plaintiff.

      Gregory G. Katsas, Assistant Attorney General; Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Loren M. Preheim); William J. Kovatch, Jr. and Aaron Kleiner, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for the defendant.

      Mayer Brown LLP (Duane W. Layton, Kristy L. Balsanek, and Sydney H. Mintzer) for the defendant-intervenors.

Restani, Chief Judge: This matter is before the court on plaintiff Globe Metallurgical, Inc.'s ("Globe") and defendant-intervenors Datong Jinneng Industrial Silicon Co., Inc., Jiangxi Gangyuan Silicon Industry Company, Ltd., and Shanghai Jinneng International Trade Co., Ltd.'s ("Defendant-Intervenors") motions for judgment upon the agency record pursuant to USCIT Rule 56.2. Plaintiff, a domestic producer of silicon metal, challenges the United States Department of Commerce's ("Commerce") final determination made in the new shipper reviews of the antidumping duty order on silicon metal from the People's Republic of China ("PRC"). See Silicon Metal from the People's Republic of China: Notice of Final Results of 2005/2006 New Shipper Reviews, 72 Fed. Reg. 58,641 (Oct. 16, 2007) ("Final Results"). For the reasons stated below, the court sustains Commerce's final determination in part and denies it in part and therefore, Globe's motion for judgment on the agency record is granted in part and denied in part and and Defendant-Intervenors' motion for judgment on the agency record is denied.

## BACKGROUND

Commerce initiated new shipper reviews of Defendant-Intervenors for the June 1, 2005 through May 31, 2006 period of review ("POR") of the Antidumping Duty Order: Silicon Metal From the People's Republic of China, 56 Fed. Reg. 26,649 (June 10, 1991).[1] See Silicon Metal From the People's Republic of China: Initiation of Antidumping Duty New Shipper

---

[1] Silicon metal is produced by combining high purity quartz in a "charge" with a source of carbon and a bulking agent in a submerged arc electric furnace. (Pl.'s Br. in Supp. of Mot. for J. Upon the Agency R. 6 ("Globe's Br."); App. to Pl.'s Br. in Supp. of Mot. for J. Upon the Agency R. Tab 6, at Ex. 3 ("Globe's App.").) The materials are heated at a high temperature and carbon monoxide is released, leaving molten silicon. (Globe's Br. 6–7; Globe's App. Tab 6, at Ex. 3.)

Consol. Court No. 07-00386                                                                                       Page 3

Reviews, 71 Fed. Reg. 42,084, 42,085 (July 25, 2006).  On October 16, 2007, Commerce published the final results of the new shipper reviews.  See Final Results, 72 Fed. Reg. at 58,641.  Commerce considered the PRC a nonmarket economy ("NME") country[2] for the purpose of these reviews.  Accordingly, it calculated normal value[3] pursuant to 19 U.S.C. § 1677b(c), which requires Commerce to collect data regarding the NME producer's factors of production[4] ("FOP") and value them in relation to the prices or costs of the FOP for the subject merchandise produced in one or more surrogate market economy countries.  See 19 U.S.C. § 1677b(c) (2000).  Commerce selected India as its surrogate country for valuing the FOP for Chinese silicon metal, concluding that although India and Egypt were both significant producers of merchandise comparable to silicon metal, the data provided for India constituted the best available information.  Issues and Decision Memorandum for the Final Results of 2004/2006 Antidumping Duty New Shipper Reviews of Silicon Metal from the People's Republic of China, A-570-806, POR 6/01/05-5/31/06, at 8–9 (Oct. 9, 2007), available at http://ia.ita.doc.gov/frn/summary/PRC/E7-20344-1.pdf ("Issues and Decision Memorandum").  Commerce also found that data from the International Energy Agency ("IEA") and the World

---

[2] A NME country is "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise."  19 U.S.C. § 1677(18)(A) (2000).

[3] Normal value is compared with the United States' price to determine whether the sales are made at less than fair value and thus, whether offsetting duties will be imposed, and in what amount.  19 U.S.C. §§ 1677a, 1677b(a).

[4] The factors of production used in the manufacturing of merchandise "include, but are not limited to [the] (a) hours of labor required, (b) quantities of raw materials employed, (c) amounts of energy and other utilities consumed, and (d) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

Consol. Court No. 07-00386                                                                                          Page 4

Trade Atlas ("WTA") provided the best information on the record for valuing electricity and silica fume, respectively, as the alternatives proffered were not reliable. Id. at 11–12, 25. Commerce further determined that the quartz consumed was properly classified as Grade I quartz, as the silicon dioxide and impurity levels matched those provided in the Grade I category of the Indian Bureau of Mines' Minerals Yearbook ("IBM Yearbook") for 2005. Id. at 20.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c). The court will uphold Commerce's final determination in an antidumping investigation unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

**I.     Selection of India as a Surrogate Country**

"[T]he valuation of the [FOP] shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by [Commerce]." 19 U.S.C. § 1677b(c)(1). When applying the FOP methodology, Commerce selects surrogate values from market economy countries that are "at a level of economic development comparable to that of the [NME] country" and have "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). Commerce normally selects a single surrogate country to value all factors, see 19 C.F.R. § 351.408(c)(2), preferring to use "the country with the best factors data," Import Administration Policy Bulletin 04.1: Non-Market Economy Surrogate Country Selection Process at *4 (March 1, 2004), available at http://ia.ita.doc.gov/policy/bull04-1.html ("Policy Bulletin").

In selecting India as the surrogate country, Commerce determined that both India and Egypt were at a level of economic development similar to that of the PRC. Issues and Decision Memorandum at 8. Commerce considered ferrosilicon and other ferroalloys merchandise comparable to silicon metal and determined that India and Egypt were significant producers of both comparable products. Id. at 8–9. Commerce concluded that production levels of ferrosilicon in India have consistently remained at the same historical levels and have matched Egypt's ferrosilicon production in recent years. Id. Commerce also noted that India's status as a net importer of ferrosilicon "d[id] not disqualify it from also being considered as a significant producer of that merchandise as well." Id.

Commerce then evaluated and compared the quality of Indian and Egyptian data for ferrosilicon and other ferroalloy production and concluded that there were many deficiencies in the data available from Egypt. Id. Commerce emphasized the importance of using data that included "investigation or review period-wide price averages, prices specific to the input in question, prices that are net of taxes and import duties, prices that are contemporaneous with the period of investigation or review, and publicly available data." Policy Bulletin at *4; see also Union Camp Corp. v. United States, 941 F. Supp. 108, 116 (CIT 1996). In rejecting Egypt as a surrogate, Commerce found that the record included no Egyptian value for charcoal and only a single price quote for the Egyptian value of both quartz and electricity. Issues and Decision Memorandum at 9. Commerce also determined that the Indian data were more contemporaneous because they corresponded to the POR, while the Egyptian data were based on 2005 annual import statistics. Id. at 9.

Consol. Court No. 07-00386                                                                 Page 6

       Defendant-Intervenors argue that Commerce should have first considered whether India or Egypt produced comparable products to Chinese silicon metal before evaluating each country's economic development relative to the PRC. (Def.-Intervenors' Rule 56.2 Mot. for J. Upon the Agency R. & Mem. in Supp. Thereof 30–32 ("Def.-Intervenors' Br.")); see Policy Bulletin at *4. Defendant-Intervenors maintain that "comparable merchandise should be identified narrowly," and that Commerce should have selected only ferrosilicon as a product comparable to silicon metal, and not other ferroalloys, which cover a much broader range of products. (Def.-Intervenors' Br. 27–29 (quoting Policy Bulletin at *3).) In particular, Defendant-Intervenors maintain that India cannot be considered a competitive producer of ferrosilicon because of the relative scarcity of electricity, an important requirement for production. (Id. at 32–33.) While Defendant-Intervenors acknowledge that the record does not contain contemporaneous Egyptian data for charcoal and that only a single price quote was submitted for Egyptian quartz, they maintain that when compared to electricity, the role of charcoal and quartz in the production process of silicon metal is relatively small. (Id. at 37–38.) In the alternative, Defendant-Intervenors argue that if the Indian data for charcoal and quartz values are found to be superior to the Egyptian data, then Commerce should utilize data from multiple surrogate countries in constructing the normal value of silicon metal because of the unsuitability of Indian electricity data. (Id. at 38.)

       The "process of constructing foreign market value for a producer in a [NME] country is difficult and necessarily imprecise," Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (citation and quotations omitted), and Defendant-Intervenors have not demonstrated that Commerce's decision to use India as a surrogate country should be

rejected. Commerce evaluated the data on the record and found that both India and Egypt were comparable market economies to the PRC and significant producers of merchandise comparable to silicon metal. Issues and Decision Memorandum at 9.

It is undisputed that silicon metal and ferrosilicon are comparable merchandise. It is unnecessary to address whether the broad category of ferroalloys is comparable. Substantial evidence supports the conclusion that India produces the narrower category of comparable merchandise, i.e. ferrosilicon. That being the case, Commerce acted reasonably in turning its attention to the quality of the available data from India and Egypt. Commerce selected India as the surrogate country because the quality of the data on the record regarding the valuation of the FOP for silicon metal in India was superior to that supplied for Egypt.

Further, Commerce was not required to find that India was a competitive producer of ferrosilicon before selecting it, as the statutory standard requires only that the surrogate country be a "significant" producer of comparable merchandise, which Commerce found both Egypt and India to be. See 19 U.S.C. § 1677b(c)(4). While Defendant-Intervenors contend that India cannot be considered a significant producer of ferrosilicon because of a decline in production due to high energy costs, Commerce determined that Indian ferrosilicon production was at 50,000 MT or more from 1998 through 2004, which Commerce concluded was "at least as high as Egyptian ferrosilicon production in the most recent years for which data is available for both countries." Issues and Decision Memorandum at 8–9. Thus, Commerce's significance finding was supported.

For the reasons stated above, the court finds that Commerce acted well within its discretion in determining that India was a proper surrogate country to use in computing the

normal value of silicon metal and based its decision on substantial evidence.

## II.   Valuation of Factors of Production

To approximate the normal value of the subject merchandise in NME countries, "Commerce solicits information from respondents concerning the quantities of various inputs consumed in producing the subject merchandise, and then uses surrogate values from a similar, market economy country to value those inputs." Tianjin Magnesium Int'l Co. v. United States, 533 F. Supp. 2d 1327, 1334 (CIT 2008). Commerce is required to use the "best available information" when valuing the FOP, based on publicly available information from a market economy of comparable economic development. 19 U.S.C. § 1677b(c)(1); 19 C.F.R. § 351.408. Commerce has "broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis." Timken Co. v. United States, 166 F. Supp. 2d 608, 616 (CIT 2001).

   *A. Electricity*

Commerce used data from the IEA to value electricity as a FOP in its final decision, because it was publicly available information and specific to the input in question. Issues and Decision Memorandum at 11. The IEA rate of approximately $0.10/KwH was found to be within the range of national electricity rates of nineteen ferrosilicon-producing countries cited by Defendant-Intervenors. Id. Commerce determined that the rate was not "unreliable simply because it differs from other countries' electricity rates," noting that because electricity is not a traded good, prices vary significantly among countries. Id. at 12 (citation omitted). Commerce also highlighted that the IEA electricity rate was used in other recent electricity-intensive cases. Id. Commerce also found insufficient evidence to prove that cross-subsidies

distort industrial electricity rates, citing the same IEA report submitted by Defendant-Intervenors, which showed that "if subsidies were removed, Indian industrial electricity rates would not materially change." Id.

Defendant-Intervenors argue that although the IEA rate is within the range of rates of nineteen other ferrosilicon-producing countries, the rate is higher than all but one of those electricity rates. (Def.-Intervenors' Br. 21; App. to Mem. of Law in Supp. of Def.-Intervenors' Mot. for J. upon the Agency R. Tab K, at Ex. 1 ("Def.-Intervenors' App.").) Defendant-Intervenors contend that the price of industrial electricity in India is distorted by government subsidies, whereby industrial electricity consumers are charged a higher rate in order to subsidize the lower rate paid by agricultural and residential electricity consumers. (Def.-Intervenors' Br. 13–15 (citing Gov't of India Planning Comm'n, Integrated Energy Report: Report of the Expert Committee, at 79 (Aug. 2006), available at http://planningcommission.nic.in/reports/genrep/rep_intengy.pdf). Defendant-Intervenors maintain that, as a result, the electricity rates are not reflective of the market-based price that would exist absent government intervention and submitted instead an Egyptian electricity rate of $0.022/KwH, which their agent received after soliciting a price quote from the Egyptian Ministry of Electricity. (See id. at 15, 25; Def.-Intervenors' App. Tab B, at Ex. 12, Tab L.)

"While accuracy is a touchstone, Commerce often finds that it has to choose between two (or more) sub-optimal data sources" and Commerce's resulting decision will be upheld if supported by substantial evidence. Dorbest Ltd. v. United States, 462 F. Supp. 2d 1262, 1275 (CIT 2006). When there is a publicly available and valid rate for a FOP from the chosen surrogate country, Commerce's normal practice is to value all factors from the same

Consol. Court No. 07-00386                                                                                        Page 10

surrogate country.  See 19 C.F.R. § 351.408(c)(2).  Although India subsidizes electricity prices for agricultural and residential consumers, Defendant-Intervenors failed to submit any evidence demonstrating that this inflates Indian industrial electricity rates.  Issues and Decision Memorandum at 12.  Only a single solicited price quote for electricity in Egypt is on the record.  No other substantial data regarding electricity rates in Egypt has been submitted on the record.  Commerce is not required to choose such a single price quote where other more broadly-based public information is available and is not shown to be unusable.[5]

In the alternative, Defendant-Intervenors suggest using the rate of $0.048/KwH, which represents an average of the country-wide rates in the nineteen countries from the IEA survey.  (Def.-Intervenors' Br. 25–26.)   This average electricity rate, however, encompasses values from countries, including the United States and Australia, that are at a different level of economic development than the PRC.  Issues and Decision Memorandum at 12.  Commerce's reasonable preference is to use surrogate values from countries at a level of economic development similar to that of the NME country in question.  Id.; see also 19 U.S.C. § 1677b(c)(4)(A).

For the reasons stated above, Commerce did not err in determining that the Indian industrial electricity rates constituted the best available information for valuing the electricity input and its determination in that regard is supported by substantial evidence.[6]

---

[5] It is obvious that there are flaws in each approach to valuing electricity.  Defendant-Intervenors have not made a claim that Commerce's investigation was inadequate in this regard.  Thus, a selection of an electricity value must be made from the data available.

[6] The parties submitted supplemental filings requested by the court concerning how
(continued...)

Consol. Court No. 07-00386                                                                    Page 11

    *B. Silica Fume*

    Silica fume, a by-product[7] created during the production of silicon metal,[8] does not have a specific subheading under the Indian Harmonized Tariff Schedule and is covered by the basket tariff subheading for all forms of silicon dioxide. <u>Issues and Decision Memorandum</u> at 24–25; (Globe's App. Tab 7, at Ex. 13). Commerce used an average unit value ("AUV") of silicon dioxide from WTA Indian import data to calculate the normal value of silica fume. <u>Issues and Decision Memorandum</u> at 24–25.

    Globe argues that Commerce has established a practice of selecting surrogate values that are as product-specific as possible, and that the WTA data is overinclusive because it includes imports from countries where silica fume is not the primary form of silicon dioxide. (Globe's Br. 11.) Globe contends that the inclusion of higher-priced types of silicon dioxide inflates the normal value of silica fume, resulting in a price that does not reflect the type of silica

---

    [6](...continued)
Indian producers obtain the electricity needed to produce ferrosilicon. While the data provided are not entirely clear, at least one report cited by all parties indicates that six of the fourteen Indian ferrosilicon producers who reported their 2001 production capacity to the Indian Bureau of Mines "have developed or are developing captive power." (Def.-Intervenors' App. Tab B, at Ex. 5.) There is little information provided as to how the remaining producers obtain their electricity, but the report indicates that some producers' electricity is purchased from an instrumentality of the Indian government. (<u>Id.</u>)

    [7] The value of a by-product is subtracted in the normal value calculation. Thus, a lower by-product valuation will raise normal value and lead to higher duties, as sought by Globe, the domestic party.

    [8] Silica fume is formed when fine particles of silicon dioxide and impurities that escape from the furnace during the production of silicon metal combine with the gas generated by the chemical reaction. (Globe's Br. 7; Globe's App. Tab 6, at Ex. 3.) It is then filtered and sold as an additive in concrete and certain heat-resistant brick to offset the cost of silicon metal production. (Globe's Br. 7–8; Globe's App. Tab 6, at Ex. 3.)

Consol. Court No. 07-00386                                                                                          Page 12

fume sold in India during the POR.  (Id. at 10.)  Globe also maintains that the relatively high price of silica fume is at odds with its status as a by-product because the total sales value of silica fume under the basket tariff category was "anything but small in relation to the value of [Defendant-Intervenors'] main product, silicon metal." (Id. at 21.)  Globe submitted evidence showing a lower price during the POR for silica fume in India including an affidavit from an American silica fume seller listing its prices of silica fume in India during the POR, WTA data on the AUV of silicon dioxide imports into India during the POR from countries that generate silica fume, Infodrive India data on the value of silica fume imports during the POR, sales invoices for silica fume sold in India by Norwegian producer Elkem, and prices for suppliers of silica fume in India provided by an Indian silica fume expert.  (Id. at 10.)

   Globe argues that the WTA data used by Commerce to compute the AUV reflected data from eleven (out of twenty-five) countries that during the POR did not produce silicon metal or any other product that is a source of silica fume.  (Id. at 13.)  Globe further contends that the WTA values Commerce used for seventeen of the countries were aberrational and that if the WTA data are relied on, only information from the seven countries that produced silicon metal and exported silicon dioxide to India during the POR should be used.  (Id. at 20, 23–24.)  The AUV of these exports, according to Globe, was $529 per MT, in comparison to the $1696 per MT for silicon dioxide calculated by Commerce using all twenty-five countries.  (Id. at 10, 12.)

   Alternatively, Globe argues that Commerce should value silica fume using either two invoices from Elkem, a leading supplier of silica fume in India, or Infodrive data, which, Globe alleges, contains more product-specific values and better corresponds with the silica fume

Consol. Court No. 07-00386                                                                                    Page 13

in question. (Id. at 17–19.) Globe argues that because there is a large difference in the value of silica fume sold for refractory versus concrete applications,[9] the use of appropriate grade-specific values for silica fume from Elkem would be more accurate and reflective of the value of silica fume generated by Defendant-Intervenors' silicon metal production. (Id. at 24.) Globe submits that Elkem's invoices demonstrate a price of $290 per MT for certain concrete applications and $675 per MT for certain refractory applications during the POR. (Id. at 34–35.) Globe maintains that the Infodrive data similarly shows that imports in India during the POR for Elkem-produced concrete-grade silica fume and refractory grade silica fume had AUVs of $294 per MT and $575 per MT, respectively. (Id. at 33–34.) Globe further argues that the Infodrive data are more specific and detailed than the WTA data because they provide a "product description" for each entry detailing "the composition and value" of the types of silicon dioxide imported into India under the basket category. (Id. at 19, 33.) Thus, Globe contends, the Infodrive data is more product-specific than the WTA data because they show that during the POR the AUV of imports for the specific by-product silica fume was $489 per MT. (Id. at 34.)

    Commerce rejected data from any individual companies submitted by Globe because of its preference for using broad market-based averages when available. Issues and Decision Memorandum at 25. Commerce also rejected the Infodrive India data because of discrepancies between them and the WTA data. Id. Specifically, the WTA data showed 8,287 MT of silicon dioxide imported during the POR while the Infodrive India data showed

---

[9] Globe relies on an unsigned statement from an individual in India with alleged knowledge of the silica fume market to demonstrate that silica fume must have at least 95% silicon dioxide content to be used in refractory applications, which accounts for its higher price. (See Globe's App. Tab 10, at Ex. 3.)

Consol. Court No. 07-00386                                                                                       Page 14

17,864 MT.  Id.  Of the inputs in the Infodrive data, 80% were not subjected to customs duties, which led Commerce to believe they were not consumption entries and did not reflect the price paid within the Indian market.  Id.  After excluding these entries, the Infodrive India data consisted of only 3,409 MT of silicon dioxide, and Commerce could not determine if this data reflected the same information as found in the WTA data.  Id.

    Ordinarily, when "faced with a choice between two imperfect options, it is within Commerce's discretion to determine which choice represents the best available information."  Dorbest, 462 F. Supp. 2d at 1277.  Here, however, the record does not support Commerce's use of the WTA data for all silicon dioxide imports under the basket tariff subheading to determine the AUV for silica fume.  Valuing silica fume based on data for the broader category of silicon dioxide captures too many products that are not the by-product silica fume.  While Commerce preferred to rely on the WTA data because it could not determine whether the Infodrive data included a "significant percentage of the WTA data," Commerce acknowledged that the Infodrive data still suggested that the WTA data were overinclusive and "may [have] include[d] higher-valued products."  Issues and Decision Memorandum at 25.

    While there are flaws with using each data set to value silicon fume, the court finds that the best available information is data that better relates to the specific by-product silica fume.  Consequently, Commerce's decision to value silica fume using WTA data for the broad basket tariff subheading of silicon dioxide, rather than data relating to the specific input at issue, was unsupported by substantial evidence.  Accordingly, the court remands this issue to Commerce in order for it to obtain better information for valuing silica fume or to use information on the record that relates specifically to the by-product silica fume.

    *C. Quartz*

    Commerce based its surrogate value for quartz on the data provided for the Grade I category of quartz from the IBM Yearbook, which defines Grade I quartz as having a silicon dioxide content of 98% or more. <u>Id.</u> at 20; (Globe's App. Tab 5, at Ex. 12.). Commerce preferred this data over the price quotes and Grade A valuation proposed by Globe, as this surrogate value is from a public source, uses a broad market average, and is product-specific. <u>Issues and Decision Memorandum</u> at 20; see also <u>Policy Bulletin</u> at *4.

    Globe argues that the quartz used by Defendant-Intervenors should be categorized as Grade A quartz, as Jiangxi Gangyuan and Datong Jinneng used quartz with a high silicon dioxide content.[10] (Globe's Br. 26.) Globe contends that a Grade I categorization of quartz allows more impurities than the quartz used by Defendant-Intervenors. (<u>Id.</u> at 26–27.)

    Globe's argument is unpersuasive. The 98% silicon dioxide content required under the Grade I category is only a minimum requirement and quartz with more than the minimum allowable silicon dioxide content may still be within this grade. Similarly, the amount of impurities allowed under the Grade I category is merely the maximum quantity of impurities allowed and does not represent the quantity of impurities that are present in all quartz found under this grading. Further, Globe does not cite to any official definition of Grade A quartz and relies instead on the internal grading of two Indian suppliers. (<u>See</u> Globe's Br. 25–28.)

    As the data from the IBM Yearbook on quartz was country-wide and publicly available and that data was not shown to be unacceptably flawed, Commerce's decision to use

---

    [10] The percentages were [[   ]] and [[   ]], respectively. (Globe's Br. (Confidential) 26.)

Consol. Court No. 07-00386                                                                                              Page 16

the data from the IBM Yearbook instead of Globe's price quotes was supported by substantial evidence.

## CONCLUSION

For the foregoing reasons, Globe's motion for judgment on the agency record is granted in part and denied in part. Defendant-Intervenors' motion for judgment on the agency record is denied. The court hereby remands this matter to Commerce to determine the appropriate surrogate value for silica fume using product-specific data.

Commerce shall file its remand determination with the court within forty-five days of this date. Globe and Defendant-Intervenors have eleven days thereafter to file objections and Commerce will have seven days thereafter to file its response.

                                                                   /s/ Jane A. Restani
                                                                     Jane A. Restani
                                                                     Chief Judge

Dated: This 1st day of October, 2008.
       New York, New York.

# NOTICE OF ENTRY AND SERVICE

     This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

     Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

     or

     Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

     Tina Potuto Kimble
     Clerk of the Court

Date: _____    By: _____
                                                                              Deputy Clerk